# THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| AMARIS RAMOS, et al., | : |
| Plaintiffs, | : |
| v. | : 3:16-CV-924 |
| | : (JUDGE MARIANI) |
| THE UNITED STATES OF AMERICA, et al., | : |
| Defendants. | : |

## MEMORANDUM OPINION

### I. INTRODUCTION

Presently before the Court is a wrongful death and medical negligence action brought by Plaintiffs, Amaris Ramos and Pedro Arce, stemming from a series of events in early 2013 that ultimately culminated in the death of Plaintiffs' six-year-old child, Pedro Arce, Jr. Plaintiffs brought the above captioned matter both as administrators of Pedro Arce, Jr.'s estate and in their individual capacities. Defendants Scranton Quincy Hospital Company, LLC, and Moses Taylor Hospital[1] (collectively "Moving Defendants"), have moved to dismiss Plaintiff Ramos's claim for negligent infliction of emotional distress and Plaintiffs' claim of corporate negligence pursuant to Rule 12(b)(6). (Doc. 17). For the reasons set forth below, the Court will deny the Moving Defendants' Motion.

---

[1] Attorneys for Moses Taylor Hospital and Scranton Quincy Hospital Company, LLC, point out that they are incorrectly identified in the Complaint as two entities. They maintain that they should be identified as Scranton Quincy Hospital Company, LLC d/b/a Moses Taylor Hospital. (Doc. 17 at 1). For clarity, however, the Court will identify the parties as they are identified in the Complaint.

## II. Procedural History

This matter presents a somewhat muddled procedural history. Plaintiffs originally filed their Complaint in the Court of Common Pleas for Lackawanna County, Pennsylvania. As several of the defendants named in the Complaint were employees of the United States for purposes of the Federal Torts Claims Act, 28 U.S.C. §§ 2671, *et seq.*, the United States filed a Notice of Removal on April 16, 2015, and promptly substituted itself as a defendant in place of its employees. The United States then moved to dismiss Plaintiffs' Complaint on the basis that Plaintiffs had failed to exhaust their administrative remedies as required by the Federal Torts Claims Act. Ultimately, Plaintiffs agreed that the Complaint should be dismissed against the United States. This Court dismissed the action against the United States, retained jurisdiction over the state law claims against the non-government defendants, and stayed the case pending resolution of Plaintiffs' administrative claim.

On May 19, 2016, after Plaintiffs' administrative claim was denied, Plaintiffs filed a new civil action with a new Complaint against all Defendants. (Doc. 1). Plaintiffs' new action—the matter presently before this Court—and their original action were eventually consolidated. Then, on December 1, 2016, by agreement of the parties, Plaintiffs voluntarily dismissed their original action in its entirety. (Doc. 12). As a result, the May 19, 2016, Complaint is now Plaintiffs' only operative complaint. That Complaint names the following as defendants: the United States of America, Moses Taylor Hospital, Scranton Quincy Hospital Company, LLC, Michael Ryan, D.O., Geisinger Community Medical Center,

Geisinger Medical Center, Geisinger Clinic, and Anthony Sauter, M.D.[2] (Doc. 1). The Complaint seeks recovery for the following causes of action: negligence (Counts I-V), corporate negligence (Count VI), wrongful death pursuant to 42 Pa. C.S. § 8301 (Count VII), a survival action pursuant to 42 Pa. C.S. § 8302 (Count VIII), and negligent infliction of emotional distress, (Counts IV-X).[3] (Doc. 1). Presently, the Moving Defendants seek dismissal of Counts VI and IV. (Doc. 17).

### III. FACTUAL ALLEGATIONS

Plaintiffs' Complaint alleges the following facts:

On January 29, 2013, Ms. Ramos brought her six-year-old son, Pedro Arce, Jr., ("Pedro") to the Moses Taylor Hospital Emergency Department with complaints of intermittent fever, cough, sore throat, and congestion that had persisted for the preceding five days. (Doc. 1 at ¶¶ 27-28). Pedro was evaluated by a physician's assistant and/or Dr. Anthony Sauter and underwent a chest x-ray. (*Id.* at ¶¶ 29, 31). The physician's assistant and/or Dr. Sauter reviewed the chest x-ray, diagnosed Pedro with acute pneumonia in his right lung (unilateral pneumonia), and discharged him with a prescription for Cefdinir, an antibiotic used to treat certain types of pneumonia. (*Id.* at ¶¶ 31-32, 36). Cefdinir, however, does not provide coverage for the treatment of atypical pneumonias, including Mycoplasma pneumonia. (*Id.* at ¶ 39). Additionally, a radiologist reviewed Pedro's chest x-

---

[2] Additionally, Moses Taylor Hospital and Scranton Quincy Hospital Company, LLC, have filed a Joinder Complaint against Emergency Services. (Doc. 44).

[3] For reasons unclear to this Court, Counts VII-X, although appearing after Count VI in the Complaint, are labeled respectively as First Cause of Action, Second Cause of Action, Third Cause of Action, and Fourth Cause of Action.

rays and found that they were consistent with pneumonia in both his lungs (bilateral pneumonia). (*Id.* at ¶ 34). Despite there being a different treatment regimen for bilateral pneumonia and unilateral pneumonia, the discrepancies between Dr. Sauter's diagnosis and the radiologist's impressions were never resolved or communicated to Plaintiffs. (*Id.* at ¶ 42).

On February 4, 2013, when Pedro's condition had not improved, his father, Mr. Arce, brought him back to the Moses Taylor Hospital Emergency Department. (*Id.* at ¶ 44). A new chest x-ray was performed and Pedro was diagnosed with bilateral pneumonia. (*Id.* at ¶ 47). Pedro was prescribed Clarithromycin, an antibiotic used to treat atypical pneumonias, including Mycoplasma pneumonia. (*Id.* at ¶¶ 48-49). The next day, Mr. Arce brought his son to Dr. Cecilia Ventura at the Scranton Primary Health Care Center.[4] (*Id.* at ¶ 52). Dr. Ventura diagnosed Pedro with acute upper respiratory infections, asthma with acute exacerbation, and acute serious otitis media, but not pneumonia. (*Id.* at ¶¶ 55-56). Dr. Ventura discharged Pedro with another prescription for Cefdinir and two nebulizer solutions. (*Id.* at ¶ 57). Dr. Ventura instructed Mr. Arce to give his son the Cefdinir and not the Clarithromycin. (*Id.*).

On February 6, 2013, Amaris Ramos brought her son back to Dr. Ventura's office in severe respiratory distress. (*Id.* at ¶ 63). Dr. Ventura diagnosed Pedro with pneumonia and admitted him to Geisinger Community Medical Center with orders to treat him with

---

[4] Dr. Ventura and the Scranton Primary Health Care Center have been deemed, for the purposes of the Federal Torts Claims Act, to be employees of the United States.

4

Rocephin, an antibiotic that does not cover atypical pneumonias such as Mycoplasma pneumonia. (*Id.* at ¶¶ 68, 72). After his admission, Pedro's condition worsened with the development of severe abdominal pain, a rash, signs of an infection, and an increased respiratory rate. (*Id.* at ¶ 77). On February 7, 2013, due to his worsening condition, Pedro was transferred to the care of Dr. Michael Ryan at Geisinger Medical Center. (*Id.* at ¶¶ 81, 83).

Once transferred to Geisinger Medical Center, Pedro's physicians began to suspect that his condition may be caused by Mycoplasma pneumonia, and one of his doctors ordered Mycoplasma titers and blood cultures. (*Id.* at ¶¶ 84-85, 88-89). A resident under Dr. Ryan's supervision also began to suspect that Pedro was developing Stevens Johnson Syndrome ("SJS"). (*Id.* at ¶ 85). Initial treatment for SJS calls for the treatment of the underlying cause or causes of the condition, and Mycoplasma pneumonia is a well-known infections cause of SJS. (*Id.* at ¶¶ 86-87). At this time, however, Dr. Ryan did not treat Pedro with any antibiotics appropriate for treating Mycoplasma pneumonia. (*Id.* at ¶¶ 88-89). By February 8, 2013, due to increased respiratory distress, Pedro was transferred to the pediatric intensive care unit at Geisinger Medical Center. (*Id.* at ¶ 97).

Pedro's condition continued to worsen on February 9, 2013, with the development of a painful rash over much of his body, and increased lipase levels indicative of pancreatitis. (*Id.* at ¶¶ 110-111). His doctors continued to suspect that he had SJS and that Mycoplasma may be the underlying cause. (*Id.* at ¶¶ 110-113). The next day, Pedro's Mycoplasma titers

returned abnormally high, indicating he had a Mycoplasma infection, and his doctors began administering an antibiotic appropriate for treating Mycoplasma pneumonia. (*Id.* at ¶¶ 115-116).

On February 11, 2013, Pedro's doctor noted that he had SJS with signs of liver failure and pancreatitis, most likely caused by his Mycoplasma pneumonia. (*Id.* at ¶ 119). Although he was now receiving the appropriate antibiotic treatment for Mycoplasma pneumonia, because Pedro's illness had gone untreated for so long, his condition continued to worsen. (*Id.* at ¶ 120). That day, due to his failing liver, Pedro was transferred to A.I. DuPont Hospital in Wilmington, Delaware. (*Id.*). He remained at A.I. DuPont until February 18, 2013, when he was transferred to St. Christopher's Hospital for Children's burn unit for treatment of his skin conditions. (*Id.* at ¶¶ 123-124). Pedro's condition continued to deteriorate until April 10, 2013, when he died in front of his parents. (*Id.* at ¶¶ 125-127).

## IV. STANDARD OF REVIEW

A complaint must be dismissed under Federal Rule of Civil Procedure 12(b)(6) if it does not allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Twombly*, 550 U.S. at 555 (internal citations and alterations omitted). In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Id.* A court "take[s] as true all the factual allegations in the Complaint and the reasonable inferences that can be drawn from those facts, but . . . disregard[s] legal conclusions and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Ethypharm S.A. France v. Abbott Laboratories*, 707 F.3d 223, 231 n.14 (3d Cir. 2013) (internal citations and quotation marks omitted).

> *Twombly* and *Iqbal* require [a court] to take the following three steps to determine the sufficiency of a complaint: First, the court must take note of the elements a plaintiff must plead to state a claim. Second, the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth. Finally, where there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief.

*Connelly v. Steel Valley Sch. Dist.*, 706 F.3d 209, 212 (3d Cir. 2013).

"[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679, 129 S. Ct. at 1950 (internal citations and quotation marks omitted). This "plausibility" determination will be a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

7

## V. ANALYSIS

The Moving Defendants seek to dismiss Plaintiff Ramos's claim for negligent infliction of emotional distress and Plaintiffs' claim for corporate negligence. The Court will discuss each issue in turn.

### A. Negligent Infliction of Emotional Distress

The Moving Defendants argue that Plaintiff Ramos's claim for negligent infliction of emotional distress should be dismissed because it is insufficient as a matter of law. "The parameters of the tort of negligent infliction of emotional distress have been difficult to define and the tort has undergone an evolutionary development." *Bloom v. Dubois Reg'l Med. Ctr.*, 597 A.2d 671, 680 (Pa. Super. Ct. 1991). In Pennsylvania,

> the cause of action for negligent infliction of emotional distress is restricted to four factual scenarios: (1) situations where the defendant had a contractual or fiduciary duty toward the plaintiff; (2) the plaintiff was subjected to a physical impact; (3) the plaintiff was in a zone of danger, thereby reasonably experiencing a fear of impending physical injury; or (4) the plaintiff observed a tortious injury to a close relative.

*Weiley v. Albert Einstein Med. Ctr.*, 51 A.3d 202, 217 (Pa. Super. Ct. 2012) (quoting *Toney v. Chester Cty. Hosp.*, 961 A.2d 192, 197-98 (Pa. Super. Ct. 2008) *aff'd by an equally divided court*, 36 A.3d 83 (Pa. 2011)); *see also Lawson v. Pa. SPCA*, 124 F. Supp. 3d 394, 409 (E.D. Pa. 2015); *but see LaLoup v. United States*, 92 F. Supp. 3d 340, 348 (E.D. Pa. 2015) (noting that the Pennsylvania Supreme Court has not definitively recognized a negligent infliction of emotional distress claim based on a contractual or fiduciary duty). The present action involves the fourth of these factual scenarios.

In the seminal case *Sinn v. Burd*, 404 A.2d 672 (Pa. 1979), the Pennsylvania Supreme Court held that, in certain circumstances, a bystander plaintiff who was not in any physical danger themselves could recover damages for the mental distress that resulted from witnessing a negligently inflicted traumatic injury to a third party. 404 A.2d at 686. The Court, however, limited such recovery only to those "emotional injuries sustained by the plaintiff [that] were reasonably foreseeable to the defendant." *Id.* at 684. The Court went on to identify three "parameters for determining whether the infliction of emotional distress was reasonably foreseeable." *Mazzagatti v. Everingham by Everingham*, 516 A.2d 672, 677 (Pa. 1986). Those three parameters are:

> (1) Whether plaintiff was located near the scene of the accident as contrasted with one who was a distance away from it. (2) Whether the shock resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident, as contrasted with learning of the accident from others after its occurrence. (3) Whether plaintiff and the victim were closely related, as contrasted with an absence of any relationship or the presence of only a distant relationship.

*Sinn*, 404 A.2d at 685 (quoting *Dillon v. Legg*, 441 P.2d 912, 920 (Cal. 1968)); *see also Mazzagatti*, 516 A.2d at 677.

In addition to the above, "a plaintiff must [also] allege physical harm to sustain an action for negligent infliction of emotional distress." *Love v. Cramer*, 606 A.2d 1175, 1179 (Pa. Super. Ct. 1992). To satisfy this requirement, it is sufficient that a plaintiff suffer from "physical manifestations of emotional suffering, i.e. depression, nightmares, stress, and anxiety." *Id.* Accordingly, "[t]emporary fright, nervous shock, nausea, grief, rage, and

9

humiliation if transitory are not compensable harm; but, long continued nausea or headaches, repeated hysterical attacks or mental aberration are compensable injuries." *Armstrong v. Paoli Mem'l Hosp.*, 633 A.2d 605, 609 (Pa. Super. Ct. 1993).

Here, it appears that the Moving Defendants do not contest that Plaintiff Ramos has adequately pleaded that she (1) was in close proximity to the traumatic event, (2) had a close relationship with the decedent, and (3) subsequently experienced physical harm as a result. Instead, all of the Moving Defendants' arguments for dismissal, although not specifically framed as such, take issue with the second foreseeability factor—i.e., the requirement that the shock resulted from a direct emotional impact upon Plaintiff Ramos from her sensory and contemporaneous observance of the accident.

As discussed above, "[a] person who does not experience a sensory and contemporaneous observance of the injury does not state a cause of action for negligent infliction of emotional distress." *Turner v. Med. Ctr., Beaver, PA, Inc.*, 686 A.2d 830, 832 (Pa. Super. Ct. 1996). Thus, a plaintiff must observe "a discrete and identifiable traumatic event to trigger recovery." *Id.* (quoting *Love*, 606 A.2d at 1177). As the Pennsylvania Supreme Court has observed,

> where the close relative is not present at the scene of the accident, but instead learns of the accident from a third party, the close relative's prior knowledge of the injury to the victim serves as a buffer against the full impact of observing the accident scene. By contrast, the relative who contemporaneously observes the tortious conduct has no time span in which to brace his or her emotional system. The negligent tortfeasor inflicts upon this bystander an injury separate and apart from the injury to the victim. Hence, the critical element for establishing such liability is the

> contemporaneous observance of the injury to the close relative. Where . . . the plaintiff has no contemporaneous sensory perception of the injury, the emotional distress results more from the particular emotional makeup of the plaintiff rather than from the nature of defendant's actions.

*Mazzagatti*, 516 A.2d at 679 (internal citation omitted).

In the case at hand, the Moving Defendants first argue that Plaintiff Ramos has not pleaded that she observed any discrete and identifiable traumatic event. (Doc. 17-1 at 7). Contrary to the Moving Defendants' assertion, Plaintiff Ramos has pleaded that she observed her six-year-old son die in front of her. (Doc. 1 at ¶¶ 126-27). This is sufficient to satisfy the "discrete and identifiable traumatic event" requirement. *See Sonlin ex rel. Sonlin v. Abington Mem'l Hosp.*, 748 A.2d 213, 217 (Pa. Super. Ct. 2000) (citing *Love*, 606 A.2d at 1177) ("[T]he plaintiff's observation of the fatal heart attack supplied the discrete and identifiable traumatic event triggering recovery under *Sinn*").

Next, the Moving Defendants argue that Plaintiff Ramos's claim should be dismissed because she did not plead that she contemporaneously understood that her son was receiving negligent medical treatment. (Doc. 17-1 at 7). For support, the Moving Defendants cite *Halliday v. Beltz*, 514 A.2d 906 (Pa. Super. Ct. 1986). *Halliday* involved a medical malpractice action in which Isabelle Halliday's husband and daughter brought a negligent infliction of emotional distress claim after Isabelle died due to complications from surgery. *Id.* at 907. In affirming the dismissal of the claim, the Court held that "[w]hile appellants were in the hospital during the operation itself and the post-operative emergency remedial measures, they never viewed any of the actual surgery. We do not believe that

11

appellant's complaint meets the 'sensory and contemporaneous observance of the accident' or the personal observation requirements of Pennsylvania case law." *Id.* at 908.

*Halliday*, therefore, merely reaffirmed that a plaintiff may not recover when they did not actually observe the negligent act or omission. The case does not, contrary to the Moving Defendants' assertion, impose a requirement that a plaintiff must possess a contemporaneous understanding that a defendant's actions are negligent in order to recover for negligent infliction of emotional distress. A more factually analogous case is that of *Love v. Cramer*, 606 A.2d 1175 (Pa. Super. Ct. 1992).

In *Love*, the plaintiff, Robin Love, pleaded that she took her mother, Marlene Love, to Marlene's primary care doctor, Dr. Cramer. *Love*, 606 A.2d at 1176. At that time, Robin expressed concerns to Dr. Cramer that, given Marlene's particular symptoms, Marlene may have had a heart condition. *Id.* Dr. Cramer, however, advised the Loves that further tests and treatment were unnecessary. *Id.* Over the subsequent few weeks, Robin took Marlene to several other doctors and back to Dr. Cramer several times in an effort to resolve Marlene's medical problems. *Id.* Then, six weeks after initially seeing Dr. Cramer, Marlene died of a heart attack while at Robin's side. *Id.* In Robin's subsequently filed action for negligent infliction of emotional distress, the Superior Court reversed the trial court's dismissal of her claim, finding that she "witnessed a discrete and identifiable traumatic event" in her "observance of her mother's fatal heart attack." *Id.* at 1177.

Particularly relevant to the Moving Defendants' argument is the fact that, although the *Love* Court noted that Robin did indeed suspect that the care her mother was receiving was inadequate, the Court in no way relied on that detail in its rationale or in coming to its conclusion. Indeed, the *Love* Court focused on the heart attack as the traumatic event which triggered recovery and commented that "[a]lthough it seems odd that the plaintiff must actually witness the negligent act itself and not just the resulting traumatic injury to the loved one, the law as it now stands dictates such a requirement." *Id.* at 1178 n.4. Significantly, however, the Court did not indicate that a plaintiff must, at the time, understand the harmful nature of the defendant's negligent act or omission in order to recover for negligent infliction of emotional distress. Instead, the Court found that Robin's "recovery, if proven, would be based upon the fact that her emotional injury was due to her first hand observation of her mother's heart attack, an event caused by Dr. Cramer's negligence, which she had also witnessed." *Id.* at 1178.

The case before this Court presents analogous circumstances. Plaintiff Ramos has pleaded that she took her son, Pedro, to the Moving Defendants' hospital and he was seen by the Moving Defendants' agents. (Doc. 1 at ¶¶ 21, 27-29). At that time, Plaintiff Ramos allegedly observed the Moving Defendants' agents misdiagnose Pedro and provide inadequate treatment. (*Id.* at ¶¶ 31-32, 34, 36-37, 39, 115). Finally, Plaintiff Ramos alleged that she witnessed her son die several weeks later as a result of the delay in adequate treatment. (*Id.* at ¶¶ 120, 126-27). Accordingly, Plaintiff Ramos has pleaded that she

viewed both the negligent act or omission—the Moving Defendants' agents' inadequate treatment—and the resulting discrete and identifiable traumatic event—the death of her six-year-old son. This is sufficient to state a claim for negligent infliction of emotional distress.

Lastly, the Moving Defendants argue that Plaintiff Ramos's claim must be dismissed because she has only alleged that she observed negligent omissions, not negligent acts. (Doc. 17-1 at 8-9). The Moving Defendants argue, in essence, that because omissions by their very nature cannot be seen, and because a plaintiff must see the negligence to recover, a negligent omission cannot form the basis of a claim for negligent infliction of emotional distress. (*Id.*). The case law, however, does not support this assertion. *See, e.g., Love*, 606 A.2d at 1178; *Bloom*, 597 A.2d at 683 ("We hasten to add, however, that we do not intend to fashion a rule that excludes recovery to all plaintiffs who allege negligent infliction based on their observance of a negligent omission by defendants. There are certainly circumstances where an omission might be construed as a traumatic infliction of injury on the plaintiff's relative and, if the plaintiff observed that occurrence, recovery could be had."); *Turner*, 686 A.2d at 833 (finding that the plaintiff had a valid cause of action for negligent infliction of emotional distress when she was forced to deliver her sister's dead fetus in a hospital that failed to provide any medical assistance).

In sum, the Court will deny the Moving Defendants' Motion to Dismiss Plaintiff Ramos's claim of negligent infliction of emotional distress.

## B. Corporate Negligence

The Moving Defendants also seek to Dismiss Count VI of Plaintiffs' Complaint, a claim for corporate negligence. (Doc. 17-1 at 9-10). "Corporate negligence is a doctrine under which the hospital is liable if it fails to uphold the proper standard of care owed the patient, which is to ensure the patient's safety and well-being while at the hospital." *Thompson v. Nason Hosp.*, 591 A.2d 703, 707 (Pa. 1991). "A cause of action for corporate negligence arises from the policies, actions or inaction of the institution itself rather than the specific acts of individual hospital employees." *Welsh v. Bulger*, 698 A.2d 581, 585 (Pa. 1997). "Thus, under this theory, a corporation is held directly liable, as opposed to vicariously liable, for its own negligent acts." *Id.*

Liability for corporate negligence is based on "a nondelegable duty which the hospital owes directly to a patient." *Thompson*, 591 A.2d at 707. Specifically, Pennsylvania imposes four such non-delegable duties on hospitals:

(1) a duty to use reasonable care in the maintenance of safe and adequate facilities and equipment;

(2) a duty to select and retain only competent physicians;

(3) a duty to oversee all persons who practice medicine within its walls as to patient care; and

(4) a duty to formulate, adopt and enforce adequate rules and policies to ensure quality care for all patients.

*Moser v. Heistand*, 681 A.2d 1322, 1324-25 (Pa. 1996) (citing *Thompson*, 591 A.2d at 707). Thus, "[t]o establish corporate negligence, a plaintiff must show more than an act of

15

negligence by an individual for whom the hospital is responsible." *Edwards v. Brandywine Hosp.*, 652 A.2d 1382, 1386 (Pa. Super. Ct. 1995). Instead, "the plaintiff must plead and prove that the hospital breached one of the above four categories of duties, that the hospital had actual or constructive knowledge of the defect or procedures which created the harm, and that the hospital's negligence was a substantial factor in bringing about the plaintiff's harm." *Stroud v. Abington Mem'l Hosp.*, 546 F. Supp. 2d 238, 245 (E.D. Pa. 2008).

Here, the Moving Defendants argue that Plaintiffs have not adequately pleaded the elements to state a cause of action for corporate negligence, but have instead only pleaded the negligent acts of individual actors. (Doc. 17-1 at 9-10). The Court disagrees. Plaintiffs have pleaded that (1) Dr. Sauter diagnosed Pedro with unilateral pneumonia on January 29, 2013; (2) on that same day, a radiologist interpreted Pedro's chest x-ray as indicating bilateral pneumonia; (3) an employee, on behalf of the Moving Defendants, reviewed the radiologist's findings and documented Pedro's diagnosis only as pneumonia; and (4) no one communicated the discrepancy in Pedro's diagnosis to Dr. Sauter or Plaintiffs. (Doc. 1 at ¶¶ 31-32, 34, 41-42). Finally, Plaintiffs have pleaded that it was the Moving Defendants' failure to formulate, adopt, and enforce policies surrounding the resolution of discrepancies in diagnoses which led to no one communicating the discrepancy in Pedro's diagnosis to either Dr. Sauter or Plaintiffs and which ultimately resulted in a delay in Pedro's treatment. (*Id.* at ¶ 161). Thus, Plaintiffs have pleaded that their son's death was proximately cause both by the negligence of individual actors and by the Moving Defendants' lack of a policy—

16

or a failure to enforce such a policy—ensuring that their son received adequate medical care. At this early stage, the Court cannot say that if Plaintiffs proved the above, they would not, as a matter of law, state a claim for corporate negligence.

Accordingly, the Court will deny the Moving Defendants' Motion to Dismiss Plaintiffs' claim of corporate negligence.

## VI. CONCLUSION

For the reasons outlined above, this Court will deny the Moving Defendants' Motion to Dismiss, (Doc. 17). A separate Order follows.

Robert D. Mariani
United States District Judge